IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                                                    Criminal No. 18-35

JOSEPH W. NOCITO

### UNITED STATES' SENTENCING MEMORANDUM

AND NOW comes the United States of America, by its attorneys, Eric G. Olshan, United States Attorney for the Western District of Pennsylvania, Gregory C. Melucci and Nicole A. Stockey, Assistant United States Attorneys for said District, along with the Tax Division of the United States Department of Justice, and files the following United States' Sentencing Memorandum:

The United States respectfully submits this Memorandum for the Court's consideration in the sentencing of the Defendant, Joseph W. Nocito (hereafter, Mr. Nocito or the "Defendant") which is scheduled for September 14, 2023.  This Memorandum supplements the United States' Response to the Defendant's Objections to the PSR and incorporated herein (Doc. 314). Through this Memorandum, the United States will: (1) detail the extensive offense conduct of the Defendant; (2) discuss the applicable Sentencing Guidelines; (3) respond to certain arguments and facts set forth by Mr. Nocito in his Objections to the PSR, Doc. 313  (PSR Obj.), and (4) explain the Government's position regarding the appropriate sentence, all substantiating why Mr. Nocito deserves to  be sentenced within the stipulated guideline range agreed to in the Plea Agreement (hereafter, Agreement) of 37-46 months in prison.

## I.   INTRODUCTION

The Defendant, Joseph W. Nocito, has pleaded guilty to committing the largest individual tax fraud in the history of the Western District of Pennsylvania.  A wealthy businessman, the Defendant defrauded the United States and its taxpayers of tens of millions of dollars in order to fund his lavish and extravagant lifestyle, which included the construction of a $30 million mansion—the largest home in Pennsylvania.  The United States submits this Memorandum to assist the Court in reaching a just and reasonable sentence that is commensurate with the magnitude of the Defendant's crime.

## II.   THE CONSPIRACY TO DEFRAUD THE IRS

Since 1997, Mr. Joseph W. Nocito has been the founding owner and CEO of Automated Health Systems Inc, (AHS), a health care brokerage company that contracts with states to enroll consumers into Medicaid HMO plans. AHS' offices are located on McKnight Road in the North Hills of Pittsburgh, Pennsylvania.  AHS employs hundreds of people in call centers in various states, and AHS' contracts with the consumer states produced large revenue and profits for AHS. AHS grew rapidly, such that between 2006 and 2011, AHS reported $266 million in income.

The success of AHS made Mr. Nocito a very wealthy man. In 2000, Mr. Nocito was in his late 50's, and a multi-millionaire.  His personal wealth enabled him to acquire real estate throughout the United States, from which he and others developed golf courses (e.g., Olde Stonewall in Ellwood City, PA), residential housing and similar wealth producing investments. The PSR revealed that Mr. Nocito currently owns or has invested in 115 businesses, including restaurants and golf courses (Doc. 310).   During the Indictment period 2006-2012, Mr. Nocito owned or controlled several companies which were originally formed to hold some of his investments, such as Northland Properties (apartments in the North Hills), and AHS Delaware

(AHS DE), which served as the management company for AHS and from which management employees of AHS Inc. were paid.  However, Mr. Nocito also held several companies that from the companies' books or tax returns, appeared to serve no legitimate business purpose, or if they once did, by the mid 2000's, did not. Such companies such as "Nocito Enterprises," Donotti Properties, or others as called by Mr. Nocito as the "Texas corps", Jonolley Properties, and Palace Development showed no outside source of revenue, and no employees on the books (hereafter Nocito Companies). However, curiously, they showed millions of dollars in revenue flowing in solely from the other Nocito companies such as Northland Properties.  By the end of their respective fiscal years (FY), except for AHS, companies showed no taxable income or even tax losses.  AHS corporate returns likewise showed surprisingly small taxable income, as low as $84,000 in 2005, and up to $2.7 and $7.6 million in 2010, despite gross revenues of $266 million. Where did all the AHS profits go?

Meanwhile, Mr. Nocito's joint tax returns similarly showed surprisingly smaller income despite his surmounting wealth.  Returns signed by Mr. Nocito collectively reported only $9.1 million (although Mr. Nocito sometimes filed joint tax returns with his wife Judith, she is not a defendant and was not under IRS investigation).  Why weren't Mr. Nocito's returns showing more taxable income?

The answer to the above was uncovered by the IRS in a lengthy, multi-year investigation which began with an audit of AHS by IRS civil investigators in 2010.  The investigation uncovered suspicious payments that were made by some of the Nocito entities which were characterized as "management fees" or "loans." Soon afterwards, based upon their investigative findings, Civil investigators referred criminal prosecution to IRS criminal investigators in 2012. Here, criminal investigators began an intense and complex investigation into the whereabouts of AHS Inc.'s

profits. Over the course of several years, leading to the Indictment in 2018, criminal investigators uncovered the single largest personal tax fraud in the history of the Western District of Pennsylvania, and one of the largest in the country. In sum, investigators determined that between 2006 and 2012, Mr. Nocito directed a sophisticated scheme to conceal over $66 million in AHS income by funneling them through Nocito entities, from which he illegally expensed tens of millions of dollars into the construction of his $30 million dollar mansion estate in Bell Acres of Sewickley that he called "*Villa Noci*", in addition to illegally expensing millions in exotic cars, travel, club memberships, homes and tuition for his children and grandchildren, including private chef, landscaper and butler.

Simultaneously, while largely expensing his home and life, Mr. Nocito concocted a scheme to funnel tens of millions of dollars in AHS pre-tax profits from AHS through AHS DE and Northland Properties (referred to as the "upper tier" Nocito entities in the Indictment, para. 21), through the "lower tier" companies such as AHSDE, Northland, Nocito Enterprises, Jonolley Properties, and Palace Development, which were funds were either expensed to Mr. Nocito in the construction of *Villa Noci* or his life, or reported as business deductions in the form of illegally characterized "management", "consulting",  "administrative" fees or "loans"  claimed by Mr. Nocito as business expenses.

It all began with the "house that Joe built." [1]

**A.   The "Villa Noci" Scheme**

*Villa Noci*
137 Beech Ridge Drive
Sewickley, PA 15143

It is common among successful businesspeople to plan how to build and spend their

---

[1] At sentencing, the United States' will present a Power Point summarizing the Nocito tax fraud scheme. Additionally, the United States incorporates the PSR Officer's  PSIR (Doc. 310).

wealth. In September, 2000, Mr. Nocito penned the following:

> *7.  Maintain the lifestyle of the 'Millionaire next door' (at least until you achieve the stage in life where have all the material things you want, your next generation is well taken care and it becomes a choice of giving it to the government or building a house of your dreams.)*

> *17. Admit some things we do aren't the most financially sound like building 50,000 SF houses, but do them anyway because you have made enough good decisions financially to do whatever you want to do.[2]*

*"Wisdom, Thoughts and Life's Lessons from Joe Nocito"*

Here begins the genesis of the tax fraud.  In September 2000, Mr. Nocito embarked upon a plan to build the house of his dreams, one that would be a testament to his financial success. He retained famed Pittsburgh architect Louis Astorino, and home builder Ed Cress, to construct the largest residence in Pittsburgh, the largest in Pennsylvania, and one of the largest in the United States. The total square footage is 51,000 sq. ft, which is only a few thousand feet smaller than the White House, but surpasses Donald Trump's Mar-A-Lago by 3,000 sq. ft.  The home is considered "Chateauesque" and needs to be seen to be believed. The design consisted of 28,000 sq. ft of living space, 9,000 sq. ft. of a finished lower level, a 5,300 sq. ft. of garages, and the porch contains 8,200 sq. ft. all situated on 6 acres of property.[3]  The home would be 5 stories high, with a lookout point. For the interior and exterior of the home, Mr. Nocito would spare no expense (particularly if was the taxpayers') in buying the most expensive building materials. The exterior would be poured concrete, limestone and 3' x 6' wood framing. The interior would be opulent, gathering materials from throughout the world: Venetian plaster and silk on the walls and cherry paneling.  The floors would consist of marble, maple, cherry, granite, and travertine. All custom hardwoods, doors and

---

[2]  Wisdom and Thoughts numbers 7 and 17 of 25, taken from a typewritten document seized by the IRS from the office of the Defendant during a search of AHS Inc. offices titled "*Wisdom, Thoughts and Life's Lessons from Joe Nocito*" dated September 2, 2000.

[3] All references the exterior design, furnishings, etc. are taken from Chub Home appraisals in 2007 and 2012, and Ed Cress room summary.  In 2012, the estimated replacement cost was nearly $30,000,000 million dollars.

windows made of mahogany and cherry.  Top of the line kitchen appliances from Sub-Zero, Wolf, and Rangecraft.  Special features of the home included 7 jet baths; temperature-controlled wine cellar and a wine tasting room; a theatre room with ornate plaster ceiling and cast stone fireplace. The first floor had an office with fireplace; sitting room, marble floors, custom staircase with wrought iron railing and crystal chandelier; a dining room with crystal chandeliers, coffered ceiling and cast stone fireplace.  The West dining room also contained a crystal chandelier, crown molding, wall molding and fireplace.  *Villa Noci* boasts 12 bedrooms, 13 full baths, and 8 half baths.

*Villa Noci* also housed a two-story great room, cherry fireplace mantel with granite surround, custom wet bar, and a patterned cherry floor.  Also featured in the home was a two-story library with built in custom mahogany cases, fireplace and balcony, multiple bathrooms, bedrooms, powder rooms, a steam room, exercise room, and even a chapel.

*Villa Noci*'s exterior is equally overwhelming. Six acres of landscaped property containing gardens, a pool, pool house, bocce court, tennis court, playground, murals on the walls of the pool, and a basketball court. The home took 10 years to complete. Now, the only question remained was how to pay for it.

### B.  The Illegal *Villa Noci* Expense Scheme

Mr. Nocito needed to fulfill his commitment in point 7 of his <u>Wisdom and Thoughts</u>. As the Defendant was accumulating all the material things he wanted, he chose to follow his own nefarious plan to not pay taxes on his earned income, but rather, hide it in his material possessions through falsified company books and illegal expense deductions on his personal and corporate tax returns.  He was a certified public accountant, and knew quite well the enormous financial windfall to him by not declaring what he was otherwise obligated to report. His accumulated wealth and

possessions would therefore come at the taxpayer's expense, and not his. First, the Defendant needed to recruit a person who would assist him in hiding the *Villa Noci* expenses. This person would need to be someone loyal to the Defendant, someone who could be trusted to conceal the illegal scheme.   Someone that had regular access to Nocito's company books, and could manipulate the records as he asked. That person would be Ann Harris, Mr. Nocito's longtime assistant and AHS company bookkeeper.

The scheme was simple: the Defendant would instruct *Villa Noci* contractors to mail construction invoices to the offices of AHS on McKnight Road. When the invoices arrived, they were received by Ms. Harris. She would open the invoice, and walk down the hall to Mr. Nocito's office, and place the invoices on his desk for payment.  The Defendant would then place a "sticky note" directly attached to the invoice and cryptically write notations on the note directing Ms. Harris where and how to expense the construction payment so as to disguise it from the IRS.  For example, recovered sticky notes show specific handwritten notes from Mr. Nocito directing Ms. Harris to fraudulently expense the construction invoice into one of the Nocito Companies Ledgers, i.e., as "advertising" "accounting", "consulting" and the like.  Ms. Harris would make the false entry into the Nocito entity "Peachtree" accounting ledgers: either Nocito Enterprises (typically noted as "N.E."); Jonolley, Donotti (the Texas corps "Jon" or "Don").  Here they could be hidden and disguised as a routine company business expense, and later deducted on the respective company 1120 signed by Nocito.

As millions of dollars in *Villa Noci* invoices poured into the offices of AHS from contractors such as Ed Cress, Aqua Pool Nelmark Electric, Archetype Studios, Rocks n' Stuff, Astorino, Tryzinski Baths, Don's Cement, Bear of PA, among others, the payments regularly were illegally expensed, both large and small as above.  For example, Archetype Design, from January

of 2007 through December 2010, was paid $84,372, but characterized in Jonolley as "repairs" or "maintenance" with checks personally signed by Mr. Nocito. Between 2006 and 2009, Boswell Lumber was paid $402,000 which was expensed through Jonolley, Palace and Northland as "consulting", "landscaping" or "development expense." One payment was as low as $17.81. Don's Cement was paid over $750,000 between May, 2006 and September, 2010 in payments expensed through Northland, Jonolley and Palace Development as "consulting", "development", "landscape" and "building."  Bear of PA installed tennis and basketball courts, a playground and a bocce court for $248,000, including a check for $36,216 from Northland Properties enclosed in a letter personally signed by Mr. Nocito in June, 2008 and expensed as "consulting."  Pittsburgh architect Louis Astorino was paid $880,000 in checks drafted against Nocito Enterprises, Northland, Jonolley and Palace, and expensed in Peachtree ledgers as "consulting."

The conspiracy was working.  *Villa Noci* was being constructed at the taxpayer's expense. For years, the expenses made their way onto company 1120 Returns, deducted on Return lines 22 or 26 as "advertising" or "other deductions", and personally signed under penalty of perjury by Mr. Nocito, and then mailed to the IRS, saving the Defendant millions of dollars in what should have been declared as personal income on his personal 1040 Returns.

Due to the success of hiding *Villa Noci* construction expenses, Mr. Nocito expanded his scheme to the *Villa Noci* house utilities: between 2006 and 2012, $429,000 in gas, light, and Edgeworth water and municipal payments were similarly expensed as "office", "utilities", and "*Villa Noci* utilities" through Northland, Jonolley and Palace. Think your home gas bill is too high? In January 2009, Mr. Nocito expensed a Columbia gas bill for $6,466.  The address for the bill was the Beechwood (*Villa Noci*) address, but in the name of Northland Properties.  No expense was beyond scheming for the Defendant.  In Point 25 of <u>Wisdom and Thoughts</u>, Mr. Nocito stated:

8

"*don't own real estate in a corporation*."  Mr. Nocito later ignored that particular commandment, and even placed the deed to *Villa Noci* in the name of Northland Properties and made monthly "rent" payments in the amount of $1,941 to Northland Properties which were also expensed.[4]

### C. Mr. Nocito Expenses His Family and a Life of Luxury

> **"*Reward Yourself.  Cars, clothing, jewelry, travel are the fruits of your labor.*"**
>
> <u>Wisdom and Thoughts</u>, pt. 25

A lifetime of hard work as an extremely successful entrepreneur naturally brings the material rewards and predictably, "conspicuous consumption."  Mr. Nocito made it a point in his bucket list.  To be clear, the United States is not maligning Mr. Nocito for his financial success or the millions he has earned.  Such is the American dream.  But the country that provided Mr. Nocito the opportunity to fulfill his dreams later became the victim of his criminal scheme.  The unlawful expensing of *Villa Noci* extended next to Mr. Nocito's personal life, his material possessions, and riches for his family.[5]   Private school tuition, artwork, *Villa Noci*'s personal butler and chef, insurance, cars and travel were unlawfully expensed through the same Nocito entities.

For example, he expensed tuition for his grandchildren at Sewickley Academy, totaling $103,000, through Nocito Enterprises, Jonolley and Palace as "advertising", "travel" and "office."  Through the same Nocito entities and false tax deductions, Mr. Nocito lavished himself with commissioned artwork from August Vernon, who painted portraits of Mr. Nocito later hung in *Villa Noci*, and an ostentatious mural depicting persons sunning themselves  on a beach in an idyllic southern Italian town on a wall overlooking the pool called "*Positano Poolside at Villa Noci*."  That artwork alone was $129,000.  Mr. Nocito unlawfully expensed 11 August Vernon

---

[4] IRS believes this unique dollar amount was chosen because it is the year of Mr. Nocito's birth. Following the IRS audit, the monthly rent was increased to $5,941.
[5] Neither Mr. Nocito's wife Judy, nor his immediate and extended family were viewed by the IRS as participants in Mr. Nocito's tax scheme, and none of the United States' arguments are intended to disparage them.

works in 2009 called the "Fitness Center Collection" for $17,000 featuring Mr. Nocito in various poses including "boxing," "fitness center workouts," as well as a portrait of Mr. Nocito winning a marathon in 59 minutes and 41 seconds called the "*Villa Noci* Marathon" for $9,000.[6]   In 2012, Mr. Nocito paid Mr. Vernon $10,200 to "redo" the gold leaf in the *Villa Noci* ballroom, with gilded walls and crystal chandeliers fit for a palace.   For six years he expensed personal fitness training for himself and his daughter through a company called "Stick with it Fitness" which totaled $112,000, frequently characterized as "advertising" in Nocito Enterprises company books.   During the same period, he also expensed personal security training with a company called "Inpax" which totaled $67,000, characterized also as "advertising."

Mr. Nocito acquired a fleet of exotic cars including Jaguars, Mercedes, Ferrari's and Rolls' Royces housed in the *Villa Noci* 5,000 sq. ft. plus heated floor garage.   In 2007, he purchased a new Maserati Quattroporte for $167,000, which included financing at $2,776 monthly through Nocito Enterprises, characterized as "interest" payments.   In 2010, Chubb appraised a collection of Mr. Nocito's 10 exotic vehicles totaling $1.7 million dollars.   He expensed $438,000 in insurance premium payments to Chubb for various insurance policies, even including personal lines.

Every palace has a butler and chef, and so did *Villa Noci.* A full-time resident, the butler performed a number of typical butler duties such as answering calls, greeting guests, planning parties, and helping to maintain the aforementioned luxury vehicle fleet.   Between 2006 and 2011, payroll checks showed that the butler was paid over $234,000**,** essentially without any living expenses.   Moreover, he was reimbursed over $168,000 for items that he purchased for Mr. Nocito

---

[6] Clearly Mr. Vernon is not a marathoner himself, as the fastest recorded marathon time was set by Kenyan Eliud Kipchoge in Berlin in 2018 at 2:01.39. However, maybe the *Villa Noci* marathon was few laps around *Villa Noci* instead?

– including gas, groceries, alcohol, and general household items for the Defendant.  Again, all expensed as "travel", "office" and "consulting."   Even a "Joe Nocito" handwritten notepad instruction to Ms. Harris directed her to issue a check to the butler for $2,229.00, and to charge all the expense categories to "travel", "office" and "insurance."

*Villa Noci* also retained a full-time chef who prepared meals for Mr. Nocito and his family. She was also placed on the Northland payroll, and between 2006 and 2010 she earned $126,000 in illegally expensed wages, and was reimbursed during the same period $115,000 for food and household items used by the Nocito family.

Mr. Nocito also had fine sartorial tastes, and Pittsburgh's famed Larrimor's benefitted from Mr. Nocito's shopping.  Purchases for custom Italian suits, shirts, suits and accessories between May and October in 2007 amounted to an astonishing $79,000-certainly dizzying for anyone unless they have their own reality TV show or are A-list celebrities.  Likely even over the top for Mr. Nocito-except that Americans whose last name is not Joseph W. Nocito paid for it. These clothes were expensed as "consulting" through Jonolley.

Mr. Nocito's immediate and extended family were also lavished with life at father's expense.  Adult children and in-laws had mortgages financed and credit cards paid by the Defendant.  For example, between 20006 and 2012, the Defendant subsided the mortgage for his son, Joseph Jr.'s home on Pine Place in Sewickley in the amount of $105,319 to Bank of America, and wrote it off as an "Arcadia interest expense" through Northland Properties.  In 2014, he expensed $17,000 of his daughter-in-law's BOA credit card through Jonolley as an "interest expense" through Jonolley and Palace Development.  In the same year, he financed a 2011 Infiniti QX56 automobile for $76,000 through Bank of America. [7]

---

[7] The United States' is not maligning the Defendant's generosity to those whom he loves. It is only the manner in which it is paid for which is before this Court.

Mr. Nocito's tax write-offs were not limited to major construction or personal expenditures. But financial records obtained by IRS investigators uncovered even relatively *de minimus* expenditures-the typical "out of pocket" purchases for most Americans. For example, in 2009 records show a purchase of holiday items from Tiffany's for $1,400, yet, written off as an "office expense." In 2009, $180.00 was "office" expensed through Jonolley to a carpenter to clean a gutter at one of Mr. Nocito's in-law's home. In 2010, $10.80 was expensed in Nocito Enterprises as "miscellaneous" towards the purchase of vitamins at a pharmacy.

In sum, thousands upon thousands of illegally expensed transactions were recorded during the scope of the conspiracy, far too many to detail here. The point however is clear and undisputable: to fulfill his dream penned in his <u>Wisdom, Thoughts,</u> Mr. Nocito set up a plan to keep for himself what otherwise belonged to the United States of America's treasury-millions and millions of dollars in unpaid personal income taxes. No expense was too insignificant nor too blatant to hide from the IRS. Despite that AHS Inc. reported millions of dollars in annual gross revenue - making the Defendant a very wealthy man - he was nonetheless committed to criminally rewarding himself instead of paying what he owed to the IRS. In total $27.3 million was illegally expensed-$21 million of which went towards *Villa Noci.* In so, he ignored the enormous criminal exposure to those around him.

Yet, the illegal expense scheme was not enough to satiate his appetite for tax fraud. So, while illegally expensing millions through essentially shell entities, Nocito coordinated another massive conspiracy to defraud the IRS by concealing millions of AHS Inc. profits through the same empty companies, which the United States' refers to as "the Money Shuffle."

### D. <u>The Money Shuffle</u>

AHS Inc. generated millions in pre-tax income during the conspiracy. In 2006, AHS' total

income was $18 million. Over the next 6 years, AHS' income grew exponentially such that by FY 2011, AHS reported $63.4 million in income.  Illegal expensing could only dent the revenue so much.  Nocito had sworn in 2000 not to "*give it to the government*" but rather keep it for himself. But how?

So, Nocito, a CPA, cooked up another calculated scheme to conceal taxable corporate income.  Nocito would move otherwise taxable AHS Inc. income into what the Indictment described as the "upper tier" and "lower tier" Nocito entities.  The income would need to be filtered down from AHS Inc, to AHS-DE, Nocito Enterprises, and then into the "Texas Corps." Jonolley and Palace Development.  However, as the revenue reached the lower entities, Nocito needed the fiscal year (FY) income statement to reflect little or no taxable revenue.  He would also need to manipulate each Nocito company FY date so that money could be shuffled to them on different dates. Finally, he needed the assistance of AHS Inc. CFO Dennis Sundo to prepare the fraudulent tax returns.[8]

For example, AHS ledgers show that in FY 2007, AHS reported total income of $32.8 million.  In order to lower AHS Inc taxable income, Nocito needed to increase AHS expenses on the 1120, which required moving money out at of its end of FY, normally in late June.  Ledgers show a rapid movement of AHS revenue in the preceding 2 weeks of the FY from AHS to AHS DE (DE).  The payments are broken into smaller denominations, and payments were normally by check.  AHS books characterized the payments to DE as "management" or "administrative" fees, but of course, no business services were performed by DE to earn the new revenue.  It was purely done to "shuffle" money to avoid having this money taxed.  In AHS Inc's  2007 1120, it declared

---

[8] AHS Inc. auditors were Bakes, Barksdale and Ickes. However, per Nocito instruction, they were directed to only audit "big AHS", and not the lower entities, for obvious reasons.

$8.8 million to DE as a "management" fee in the "other deductions" page.  The effect of this was to significantly reduce AHS Inc. taxable income, to approximately $1.7 million, which was later fraudulently reported to the IRS in its 1120 signed by Joseph W. Nocito. Now, what does AHS DE do with the late new revenue?

In Step 2, DE's FY is manipulated to end in February 2009.  DE reports on its ledgers an additional $8.8 million as an "admin" fee from AHS.  Late in DE's FY, DE now, similar to AHS, begins repetitive "11th hour" payments of funds, but now the same funds are "shuffled" into Nocito Enterprises.  $9.1 million to be exact, which DE characterized as an "outside services" expense on its 2009 1120.  Similarly, these fees are reported on DE's 2009 1120 on the "Other Deductions" page, conveniently aiding in reducing its taxable income to "0" for 2009.

In Step 3, Nocito Enterprises now declares the $9.1 million from DE as income. Nocito Enterprises reported on its ledgers the DE payments as "consulting" and "management" fees.   As its FY nears its end in September 2009, not surprisingly, its books reveal millions of dollars being transferred to Jonolley Properties- $3 million dollars to be exact-which Nocito Enterprises fraudulently classified as "consulting expenses" and deducted on its 2009 1120.  For example, Nocito ledgers show 12 consecutive transfers of $200k to $300K between September 22nd and 28th, 2009.   This fraud fraudulently increased Nocito Enterprises' expenses, which were characterized as an "outside service" expense on its 1120, thereby reducing its total taxable income to a negative $19,000 in a return signed by Joseph W. Nocito.

What happened to the $6 million dollar difference?  Nocito Enterprises was a frequent target for the illegal expensing of *Villa Noci* and so, the money dissipated rapidly.

Next, Jonolley Properties is roped into the shuffle. Jonolley is one of the companies Mr. Nocito referred to as the "Texas corps." By 2010, it has no outside revenue, and had no employees.

Jonolley's FY ended August, 2010.  Jonolley reported the $3 million from Nocito Enterprises as "management Income" on its books, and on its 2010 1120.  As its FY came to a close in September 2010, Jonolley needed to move money out quickly, and at Mr. Nocito's direction, transferred $3.47 million dollars to the other Texas corporation called Palace Development Company.  Jonolley reported these payments as "outside services" on line 26 of its 1120 deductions statement, the effect of which increased its 2010 1120 deductions, and reported "0" taxable  income in 2010 in a return signed by Joseph W. Nocito.

Finally, Palace Development, with no outside revenue and no employees brings up the rear to bring the scheme full circle.[9]  Palace's FY ended in February, 2011. Palace reported the $3.47 million as "consulting income" on its books and 2011 1120. [10]  Indeed, in 2011, the only reported income for Palace was the Jonolley payments.  Since Palace was at the end of the line, and the Defendant was determined not to pay tax on the remaining Jonolley income, Mr. Nocito directed that in the last two months of its FY, the $3.171 million be returned to Jonolley, reported it as "Consulting Fees" on its 1120.  So, between January and February 2011, Palace ledgers show successive "hollow" transfers without any business purpose to Jonolley.  On February 10th 2011 alone, Palace transferred $2.5 million to Jonolley, and Palace pays little tax.

In the 2010 civil audit, IRS civil investigators began to unwind the fraud, alerted to the suspicious "management fee" transfers.  Soon afterwards, it became evident that they were not dealing with a few curious transfers, but millions of dollars in hidden, unreported personal and corporate income.  Criminal investigators further investigated and completely dissected fraudulent

---

[9] Essentially, none of the Nocito entities, particularly Jonolley, Nocito Enterprises, nor Palace Development earned any outside revenue that did not originate from another Nocito company. They held no employees, and provided no services. In 2010, their existence was solely to conceal taxable AHS profits.

[10] It should be noted that with respect to all  the 1120 Returns and forms (except for AHS Inc.) CFO Sundo, also a certified public accountant, prepared the tax returns and entered the deductions, etc. for Mr. Nocito's signature.

expensing and money shuffling.  Investigators calculated that during the scope of the Indictment, the Defendant shuffled $110 million from AHS Inc. to other Nocito companies, $27 million of which found its way disguised either as "advertising", "office" "consulting" (or similar deceptive language) which the Defendant used to build his dream home, *Villa Noci*, or were hidden as empty management or consulting fees through his companies.

The tax loss is staggering. After IRS investigators corrected the Defendant's personal 1040 tax returns, tens of millions remained unreported and untaxed.  $27.302 million of personal and corporate income remained unreported and untaxed, $21 million of which has built into *Villa Noci* fraudulent expenses. Investigators recalculated the Defendant's personal tax liability for the same years at $4,044,946.  Corporate tax returns were also re-calculated, and uncovered $11,779,10 in unpaid taxes.[11]

The Nocito fraud scheme collapsed, and in 2018, Mr. Nocito was indicted on one count of conspiracy to defraud the IRS, along with 9 counts of filing both false personal and corporate income tax returns.   The Defendant spent four years afterward unsuccessfully litigating constitutional challenges and several pretrial motions to dismiss and repeated requests for reconsideration when those motions were denied.  The case was set for trial in January 2023. On November 17, 2022, Mr. Nocito elected not to fight the immense allegations of criminal tax fraud, and pleaded guilty to one count of conspiracy to defraud the United States, with a stipulation to pay $15,824,056 in unpaid personal and corporate income taxes and a stipulation to recommend a Sentencing Guideline range of 37-46 months incarceration.   The matter is currently set for sentencing September 14, 2023.

---

[11] During the conspiracy years, Mr. Nocito paid approximately $15.824 million in personal and corporate taxes, leaving a tax owed balance of $15,824,056, which is the stipulated tax loss in the Plea Agreement. The Defendant paid $5,000,000 at the time of the Plea Hearing.

### III.    THE PLEA AGREEMENT AND THE PSR

Mr. Nocito pleaded guilty pursuant to the terms of a negotiated written plea agreement (hereafter, Agreement).  In exchange for the Defendant's plea of guilty to Count One, he agreed to accept responsibility for the other charged counts, to waive appeal, and to make full restitution. He also stipulated to a negotiated USSG of 37-46 months incarceration. Agreement, Subsection C, paras. 2-4.  (The United States incorporates its Argument in its Responses to the Objections to the PSR, section II.  Doc. 314.)

The PSR USSG calculation is correct in its methodology of calculating the guideline range, beginning with the tax loss, and adding Offense Characteristics and Adjustments where appropriate.  See PSR, Doc. 310 paras 21-30.  The PSR Officer's range as calculated arrived at a total offense level of 31, a criminal history category of I, with a resulting sentence range between 108-135 months incarceration. Id., para. 51.   Agreement, *supra*. C 2-4.   The PSR Officer's calculation is appropriate, but as the Officer acknowledges, the statutory maximum sentence for Conspiracy to Defraud the United States is 60 months, or 5 years, so the USSG calculated range becomes legally unenforceable given the statutory cap. 18 U.S.C. §371. Nevertheless, it deserves the Court's consideration in the evaluation of the § 3553 factor because it reflects the following factors which this court may consider when imposing sentence:

**A.  <u>The Tax Fraud was Massive in Dollars, Length and Complexity</u>**.

The tax numbers in this fraud are gargantuan. Nearly $27 million dollars went unreported income from Nocito's personal and corporate tax returns between 2006 and 2012.  The restitution alone is over $15 million dollars. These numbers are rarified air in the Western District of Pennsylvania, and to date, the largest individual tax fraud in the history of this District.  The longevity and dual nature of the scheme-illegal expensing of millions of dollars towards the

construction of *Villa Noci*, and enriching himself and his family with lavish expenditures at the taxpayer's expense involved thousands and thousands of illegal ledger entries, hundreds of pages of invoices and books, and dozens of false entries in tax records.  And of course, the fruits of the fraud produced a $30 million dollar palatial estate, and millions in lavish spending.

### B.  <u>The Tax Fraud Was Sophisticated In Its Execution</u>

The success of the fraud depended upon the Defendant's tax preparation and CPA skills, and the cooperation of at least two significant members of AHS Inc. Because of his position of authority, he was able to draw both Ann Harris and Dennis Sundo into his scheme.  It persisted for at least 6 years.  Only the Defendant's confidantes were permitted to join in, lest auditors or an unwitting employee sense a crime was occurring.   It required coverups, deceit, and careful movement of money at the right moments, all designed to throw off the scent of the IRS hound dogs.

### C.  <u>The Fraud Victimized the U.S. Treasury and Americans</u>

The U.S. Treasury depends upon tax revenue from honest, hardworking Americans. In order to make government work, everyone needs to pay their fair share of the tax.  Tax fraud has an enormous impact on the economy.[12]  It is not a "victimless" crime, since ripping off the IRS cheats not only our government, but other honest paying taxpayers.

### IV.    SENTENCING PRINCIPLES and § 3553 FACTORS

The Court is familiar with the Sentencing Guidelines and the law of sentencing, particularly in this post-*Booker* age.  We nonetheless think it helpful to review briefly the governing legal principles in this area.

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to

---

[12] Before a senate panel in 2021, IRS Commission Chuck Rettig estimated tax fraud costs the Treasury and estimated 1 trillion dollars annually.

play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of Defendant," the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker, id*. at 260 (citations omitted); *see also id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, the other factors set forth in Title 18, Section 3553(a), must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the Defendant; and

> (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See*, 18 U.S.C. § 3553(a). *See also*, *United States v. Thornhill*, 759 F.3d 299, 312–13 (3d Cir. 2014).

And, as always, when imposing a sentence, a district court must follow a three-step process: first, courts must determine to calculate a defendant's sentencing guidelines sentence; second, district courts must formally rule on the motions of both parties, and state on the record whether they are granting a departure and how that departure affects the guidelines calculation, and third, districts courts must exercise their discretion by considering the relevant statutory sentencing factors in setting the sentence they impose, regardless of whether it varies from the sentence calculated under the guidelines. 18 U.S.C.A. § 3553(a); U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A. *United States v. Handerhan*, 739 F.3d 114 (3d Cir. 2014).

A. <u>**What was the Nature and Circumstance of the Tax Conspiracy?**</u>

The crime committed by Nocito as summarized above and reflected in the power point to be presented by the United States at the Sentencing Hearing will provide this Court with enough information to understand the magnitude of this crime. At the core of it was Mr. Nocito's irrepressible greed, and at some level, a disdain for the United States government-or at least, the U.S. Treasury. He likely never anticipated that the words he whispered to himself and then etched in September 2000 would later haunt him: A "*choice of either giving it to the government or building a house of your dreams.*" <u>Wisdom and Thoughts</u>, pt. 7. From the outset, the Defendant

20

determined that he simply would not pay his share of taxes.  Despite years of preparing tax returns as a CPA, and advising clients about honest tax preparation, he himself would not.  Call it insolent and audacious. Not only for himself,  but in causing others to behave the same.

Years and years passed, and millions in unpaid taxes mounted.  With the undisclosed wealth, he could acquire "*all the material things*" he wanted-and did. *Id.* pt. 7:  A $30 million dollar home, exotic cars valued at $1.7 million, multiple exclusive country club memberships, over 100 business which he controls or has interest, travel, privilege and the prestige that accompanies it.  What "doth it profit" in the end?

During the conspiracy, AHS was showing significant increases in gross revenue, and no doubt Mr. Nocito's income increased commensurately.  He had the personal resources, and his willingness to make full restitution of roughly $15 million (including $5 million paid at the plea hearing) and to pay "any fine up to the statutory maximum" imposed by the Court suggests that he is still hugely prosperous, though we can only speculate. PSR, para. 50.[13]

Although Mr. Nocito was charged with counts of Conspiracy to Defraud the IRS and filing false income tax returns, more might have been charged but for the impracticality of charging the proverbial "kitchen sink": tax evasion, tax money laundering, and other Title 26 crimes.  With conspiracy come conspirators, and here, close friends and longtime employees Ann Harris and Dennis Sundo.   Their inducement exposed them to crimes and tax losses beyond their understanding.  And, because Mr. Nocito filed joint personal income tax returns, did it occur to him also the potential criminal exposure to his wife, Judith?  And what of his children? Did Joseph Jr. and Gina understand that the rewards of being a son or daughter of Joseph W. Nocito might have come in exchange for Mr. Nocito's perpetration of the largest tax fraud in the history of this

---

[13] Disappointingly, Mr. Nocito refuses to complete the "Net Worth and Monthly Cash Flow Statement" to the Probation Officer and this Court. What might this suggest?

District? In the end, only Mr. Nocito's pure hubris could equal the enormity of this tax fraud.

**B.  Who Is Joseph Nocito?**

The PSR tells us a bit about him.  Born in 1941, one of three children, his father worked as a salesman for Catholic Magazine, and then later as an electrical worker.  As was more commonplace then, his mother worked as a homemaker and part-time at a pharmacy.  By all accounts he had a stable, loving upbringing, which appears to have been also largely influenced by their Catholic faith.  He married in 1965, later divorced, and his first wife is now deceased. Joseph Jr. and Gina are the offspring of his first marriage.  He married his current wife Judith in 1988, and they both live together at *Villa Noci*.

He graduated from Robert Morris in 1970 with a business and accounting degree.  He was a CPA until 2004.  He reported being gainfully employed since his teenage years, and as a professional worked as then "Touche Ross" in 1970, and an accountant for Connecticut General Life until 1984.  For many years, the Defendant prepared personal tax returns for clients.  The PSR reported that in the early 1980s he began to form some of his companies, and then in 1997 became the CEO of AHS Inc. *see* PSR, paras. 37-39; 45-49.  According to the IRS investigation, Mr. Nocito owns or controls dozens of businesses in real estate, food service and a nationally recognized golf course north of Pittsburgh called "Olde Stonewall."  He has assumed the fiscal affairs of AHS Inc. since 1979, and during the fraud, was its President and CEO.

His net worth is likely at least in the tens of millions.  A $30 million dollar primary residence (along with another residence on Bucktail Drive in Allison Park).  He has accumulated millions of dollars' worth of personal property and exotic sports cars, and no doubt substantial funds in insurance policies.  The PSR reported that one of his bank accounts currently has a balance of at least $1.9 million dollars.  By all appearances, few things are beyond his financial reach.  As

he said in 2000, *"[R]eward yourself. Cars, clothing, jewelry and travel are the fruits of your labor."* <u>Wisdom, Thoughts</u>, pt. 10.  He knew that some decisions "*weren't financially sound, like building 50,000 sq. ft. houses*" but he had made enough good decisions "*to do whatever you want*." *Id*. pt. 17.

A takeaway from <u>Wisdom and Thoughts</u> can be distilled to three overriding goals in his life:  work hard, earn as much as you can, and reward yourself with material goods. And frankly, it appears that he reached all three goals.  However, the Defendant's 25 commandments tell us more about the person inside.

As any successful entrepreneur, he carefully planned how to achieve independent wealth, employing all the standard motivational tools, winning friends, and influencing others.  He gave seemingly inordinate attention to accumulating and protecting money:  *"treat each dollar you come into contact with as if you are its Shephard. If you take good care of it now, it will take good care of you for years to come*." <u>Wisdom and Thoughts, pt. 5</u>.  "*Own rental properties. Some people are renters for life*."  *Id.*, pt. 9.   He spoke of hard work. " *Work hard. Rise at 5:25 am. Be at the office by 9:25 am. Have dinner with your wife, and then get some more work done until 10:00 pm. Id.* pt. 8.  The Defendant on gambling: "*If you're going to gamble, pick the game with the biggest odds and greatest excitement…craps." Id.* pt. 11.

<u>Wisdom and Thoughts</u> also gives us insight into the Defendant's management style. "*Pay off the debts on your businesses*." *Id.* pt. 13  "*Sign all the checks. If people know you are watching, much more care is given to financial decisions*." *Id.*, pt. 15.  "*Get your family in the business*" Id. pt. 18.  <u>Wisdom and Thoughts</u> features more "goals" such as achieving financial goals and doubling them, and diversifying portfolios.  *Id.*, pts. 19 and 20.  He cautioned that when bringing on new partners, "*determine if there is integrity in their dealings*" an ironic twist.  The Defendant

carefully scripted how to reach his financial dreams, no different than the planning and script to defraud the IRS. He would not let the IRS and an "unfair" tax system interfere, since he made it his decision not to.  It was in the top 10 of his anthology.

### C.  <u>Mr. Nocito Ignored the Seriousness of His Crimes, Disrespected the Tax Laws</u>.

The seriousness of financial crimes in the federal criminal code and under the Sentencing Guidelines is primarily controlled by the size of the financial fraud, in other words, how much was stolen.  Frankly speaking, a $26 million dollar tax fraud deserves punishment that equates with the amount and scale of this fraud.  The seriousness of this crime cannot be understated, and has been summarized in the PSR and above. Additionally, the United States' will offer evidence in the form of a summary PowerPoint presentation at the sentencing hearing detailing the manner and means of the tax fraud conspiracy.  The PSR guidelines recommend a staggering range of 108-135 months incarceration, which included only one sentencing enhancement (concealing $10,000 or more in any tax year-USSG 2T.1(b)(1), and only one adjustment (sophisticated means-USSG 2T1.9(a)(1). That is anywhere between 9 and roughly 11 years in prison.   There is precedent for lengthy prison sentences for Title 26 and Title 18 financial frauds.  Attached is a chart summarizing cases for which lengthy prison sentences have been imposed for tax crimes-even with older defendants. *see* <u>Govt. Ex. 1</u>, attached hereto.

### D.  <u>A Serious Sentence is Necessary to Deter Other Tax Fraudsters</u>

This sentencing has the attention of the Department of Justice (DOJ) components and has generated substantial media attention, largely driven by the size of the tax fraud and curiosity about *Villa Noci*.  DOJ Tax Division views the case as a major case.  Additionally, the upcoming sentencing has gained the attention of the <u>Tribune Review</u> editorial statement ridiculing Mr. Nocito's request for no incarceration.  *see*, <u>Govt. Ex. 2</u>, attached hereto.

One of the paramount factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). We respectfully submit that a substantial term of imprisonment – that is, within the stipulated range of 37-46 months – is essential to achieve the goals of general and specific deterrence, especially given the nature of the tax fraud schemes involved, his position, and professional status as a CPA.

As the Sentencing Commission cautioned sentencing courts about the necessity of giving significant consideration to deterrence when imposing sentence in a Title 26 case:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Ch. 2, Pt. T, intro. comment.

Furthermore, the need for general deterrence is most compelling in those cases involving particularly lucrative schemes and difficult-to-detect criminal activity. *See, United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *See also*, *United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32 month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it"). Thus, in order to provide adequate general deterrence, the sentence in long-running tax crimes with complex components such as the one committed by Mr. Nocito must be

significant.  The punishment must equally be more significant where, as here, the financial benefits to those committing the crimes – that is, the proceeds of the offense – are more significant.  The sentence recommended by the Guidelines is significant enough to deter would-be tax cheats who might otherwise choose to gamble that if they orchestrate and execute tax frauds through use of multiple corporate entities they will not be caught.

General deterrence is an essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud.  The United States tax system relies on voluntary compliance.  *See*, *United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system").  The IRS's most recent study of tax compliance estimates that only 83.1% of individuals are compliant, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes.  *See generally* "Tax Gap Estimates for Tax Years 2008-2010," April 2016 .  "Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, In Defense of Individual Tax Privacy, 61 Emory L.J. 265, 321 (2011-2012).

These studies emphasize the impact that noncompliance with the tax code has on the United States Treasury and the deterrent impact prison sentences have on other potential tax scofflaws.  Hundreds of billions of dollars are lost annually because people like Mr. Nocito – who otherwise takes full advantage of all that taxes bring, such as schools, paved roads, transit systems, and Government buildings – choose to shirk their responsibilities as American taxpayers.  Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits every court's consideration when sentencing defendants for committing tax offenses.  Meaningful sentences – that is, ones that, through their terms, speak loudly – must be given in cases such as this so that

others are forewarned of the consequences for engaging in such complex, long-running tax crimes.

The Fourth Circuit has explicitly endorsed the vital importance of incarcerating tax scofflaws as a means of general deterrence:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th 2010).  As pointed out by the court *Tana*, the need for incarceration as a result of the tax evader's violation of the basic compact under which all American income-earners live:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.  The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.  I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States v. Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13); *see also*, *United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions").  *See, United States v. Werdiger*, 10 Cr. 325 PGG (November 9, 2011; Tr. at 49-50);  *See also*, *United States v. Mullahy*, 10 Cr. 554 WHP (November 23, 2010; Tr. 10) ("Looking at the 3553(a) factors in this case, the Court agrees with the Government that tax crimes are not prosecuted frequently and, therefore, there is a need for deterrence.")

In sum, the Government cannot ensure compliance with the Internal Revenue Code if the general public believes there are no meaningful repercussions for failing to comply with tax laws

and regulations.  Sentencing Mr. Nocito to a significant term of incarceration will convey the message to others that systematic and repeated efforts to cheat on one's taxes, combined with repeated efforts to obstruct the IRS's investigation of that cheating, will be met with harsh punishment.

**E.  Lengthy Guidelines Sentences Have Been Imposed on Non-Violent Offenders in this District**.

Judges sitting in the Western District of Pennsylvania have sentenced many defendants to "lengthy" sentences, irrespective of mitigating factors.  That is because as it is frequently stated, those who commit "*serious crimes deserve to do serious time*."  Here, the guidelines calculation by the probation officer demonstrates that 108 months incarceration reflects an enormously complex financial fraud.  None as in the size or subset of Title 26 crimes has heretofore been before this bench.  But the United States urges this Court that when considering the disparity of sentences, it should not focus exclusively on tax crime statistics.  The Court takes the Defendant as he or she is brought before her.  Whether Ponzi, cyber, identity theft, mail or wire frauds, or any of the "garden variety" financial frauds, there are victims who are genuinely harmed.  The specific statutory criminal charge the Defendant is charged with is immaterial.  A defendant who perpetrates a  $15 million dollar social security administration fraud, a $15 million dollar network intrusion, or a $15 million dollar Ponzi  should be treated no differently at sentencing than a $15 million dollar tax fraudster.  So, this Bench has indeed imposed serious sentences on "white collar" fraudsters who deserved serious punishment, irrespective of the crime charged:[14] *see, e.g.*, *United States v. John F. Hogan* (17-100, Hornak, J.) (78 year old independent insurance agent sentenced to 10 years' incarceration for running a $10 million dollar Ponzi scheme); *United States v. Randy*

---

[14] Of course, it would be impossible to list all the white collar fraud sentences in this District. Sufficeth, these are some of the more notable, recent lengthy sentences in fraud cases.

*Frasinelli* (21-300, Hardy, J) (67 year old Payroll Protection Program fraudster sentenced to 78 months); *United States v. Arlinda Moriarty* (18-315, Bissoon, J) (54 year old fraudster sentenced to 84 months in health care fraud; conspirator Tamika Adams received 6 months); *United States v. Stephanie Roskovski* (19-106, Stickman, J) ( company embezzler sentenced to 51 months). *United States v. Justin Johnson* (20-94,  Hornak, J) (cybercrook sentenced to 84 months in prison for hacking UPMC network).  Consequently, this Court should not be uncomfortable sentencing this Defendant withing the recommended guideline range.

## V. THE DEFENDANT'S MOTION FOR DEPARTURES AND VARIANCES MUST BE REJECTED

The Defendant seeks both variances and departures from the stipulated guideline range to a non-incarceration, home confinement sentence in the comfort of his 2,500 sq. ft. home in the north hills of Pittsburgh.   Such would be a charade.  But consider, the Defendant has already earned his departures and variances in several ways. First, he received the benefit of a negotiated plea agreement wherein he pleaded guilty to one count, thereby capping the statutory maximum sentence at 60 months incarceration.  Second, the United States did not seek enhancements or adjustments to the guideline range in the Agreement that the probation officer applied.  If so, it would have placed him in a guideline range above the statutory maximum sentence.  Third, the Defendant benefitted from a lower loss range-$3.5 million to $9.5 million in exchange for his agreement to make full restitution of $15 million dollars at sentencing. So, all told, he has received a variance/departure from what would otherwise have been a moonshot, above the statutory maximum guideline range.   The Defendant is not entitled to any further sentence reduction. Nevertheless, the United States will respond to the Defendant's Motions as follows.

29

A. **Nocito's Age and Medical Issues Do Not Warrant Any Departure from the Guidelines**

First, Mr. Nocito alleges that because he is 81, has knee issues, struggles with obesity and high-blood pressure, needs to monitor his melanoma, and has issues with his gait, the Court should grant him a downward departure. (Obj. to PSR, pp. 4-5, 22-23). Initially, Chapter 5, Part H of the United States Sentencing Guidelines provides that age (including youth) "may be relevant in determining whether a departure is warranted" but that such considerations must be "present to an unusual degree and distinguish this case from the typical cases covered by the guidelines." USSG §5H1.1 (emphasis added). Further, "physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted" but only if "present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." USSG §5H1.4 (emphasis added). Additionally, the guidance states that an extraordinary physical impairment must be the reason to depart downward. *Id.* Home detention is extraordinarily rare in place of what otherwise should be incarceration, and, only in the case of "a seriously infirm defendant. *Id.* Neither Mr. Nocito's stated medical conditions, nor his age, warrant a departure under this Section.

Courts have repeatedly held that age alone is roundly discouraged as a basis for departure under the sentencing guidelines, and only worth considering if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case where the factor is present. *See e.g.*, *United States v. Sally,* 116 F.3d 76, 80 (3d Cir.1997); *United States v. Higgins,* 967 F.2d 841, 845-46 (3d Cir.1992); *United States v. Shoupe,* 929 F.2d 116, 120 (3d Cir.1991); *United States v. Marin-Castaneda,* 134 F.3d 551, 556-57 (3d Cir.1998) (upholding the district court's denial of a downward departure and noting that absent some extraordinary infirmity, the defendant's advanced age did not warrant downward departure); *see also*, *United States v. Neal*, 294 F. App'x 96, 103–04 (5th Cir. 2008); *United States v. Johnson*, 242 F. App'x 7, 12–13

(4th Cir. 2007) (holding that age did not justify a variance for an elderly defendant in "fair" health); accord *United States* v. *Lewis*, 594 F.3d 1270, 1276-77 (10th Cir. 2010) (affirming 330-year sentence for fraud offenses and upholding district court's rejection of a 72-year old defendant's request for a variance based upon age and health and holding that Sections 5H1.1 and 5H1.4 specifically discourage consideration of age unless the defendant was "infirm"); *United States v. Rowan*, No. Crim. 06-321, 2007 WL 127739, at *6 (E.D. Pa. Jan. 10, 2007).

Here, Mr. Nocito is 81 years old, and in 2023, that age is not what it was in 1963.  Medical science is more advanced, and diseases that disabled or killed persons at that age 30 years ago can be treated, enabling older adults to live fuller and lengthier lives.  Consider that Mr. Nocito began this scheme when he was nearly 60, and continued it for another decade.  The investigation determined that even recently, Mr. Nocito has led a reasonably active life, going to the office on a daily basis, playing golf, and traveling with his wife.  Indeed, a knee replacement is common for older adults, enabling them to resume a very active recreational life.  It was not the United States that selected the age for prosecution-the government takes a defendant in the condition and age when charged.  Most tax fraudsters commit tax crimes later in life when they have accumulated wealth, not early in professional careers.

Even when it is likely to equate to a "life sentence" given a defendant's age, courts have ignored that consequence and instead rightly sentenced substantially on the gravity of the crim. For instance, in *United States* v. *Seijan*, 547 F.3d 993, 998 (9th Cir. 2008), the district court sentenced an 87-year old defendant to 240 months' imprisonment for a serious fraud offense. Affirming the district court, the Ninth Circuit noted:

> Seijan argues that the district court did not adequately consider his advanced age. This argument is meritless. The district court acknowledged that Seijan's age and health reduced the likelihood of recidivism, and it addressed Seijan's concern that the 20-year sentence at age 87 was tantamount to life imprisonment. The district

court even considered the sentence that a defendant without a prior conviction would receive. Indeed, the sentence imposed by the district court was 22 months below the low end of the Guidelines range. Seijan argues only that the reduction should have been even greater. On this record, however, the district court's sentence was reasonable.

547 F.3d 993. *See also*, *United States* v. *Dowd*, 451 F.3d 1244, 1256-57 (11th Cir. 2006) (rejecting the defendant's argument that his 305-month sentence was unreasonable because he was 65 years' old); *United States* v. *Kerns*, 2009 WL 1956258 at *1-*2 (11th Cir. July 9, 2009) (unpublished) (rejecting the defendant's argument that his 240 month sentence for fraud offenses, which was already a departure, was a *de facto* life sentence and noting that "the district court weighed Kerns's advanced age against the seriousness of his offense and the need to protect the public from fraud"); *United States* v. *Moses*, 2009 WL 1935930, *1-*2 (6th Cir. July 6, 2009) (sentencing a 71-year old defendant to 210 months on conviction for a fraud that involved a $15 million loss, the use of false statements and documents, and the use of shell companies to conceal the fraud).

**B. <u>Mr. Nocito's Medical Condition Is Not Extraordinary for Someone His Age</u>**

Nor is his current medical condition so advanced that it should keep him out of prison.  See USSG §5H1.1 or §5H1.4.  First, none of the illnesses are disabling. None make him infirm, bedridden, or certainly not an invalid. None need daily medical attention or monitoring. The most serious condition reported in the PSR is melanoma surgery in October, 2022. Following surgery, he was advised to follow up with his dermatologist and oncologist, and currently undergoes routine skin scans. Fortunately, there appears to be no active cancer.  The other reported medical conditions are usual age-related diseases that affect millions of older adults, such as failing knees and arterial blockages.  As for both, the PSR reports he is receiving top flight medical cares.  He is scheduled to undergo bilateral knee replacement in November, and is being prescribed medication for his heart. PSR para. 40.  Otherwise, he has no serious medical disease which

requires invasive treatment. *Id*.  The PSR also notes that he takes daily vitamins and over-the-counter supplements, and some pain medication.  He has no mental illness.  There is absolutely nothing extraordinary about his medical condition that cannot be managed by the BOP in a prison setting.  Precedent exists that even defendants with much more serious medical diseases have not benefitted from a downward departure.

For example, in *United States v. Lewis*, the Tenth Circuit refused to uphold a downward departure for a 69-year-old defendant who suffered from chronic cardiovascular disease, chronic peripheral vascular disease with hypertension, obstructive pulmonary disease, and back pain. *United States* v. *Lewis*, 594 F.3d 1270, 1276-77 (10th Cir. 2010).   In *United States v. Krilich,* 257 F.3d 689 (7th Cir. 2001), the court determined that the defendant did not establish a debilitating or extraordinary condition warranting a downward departure and a non-incarceration sentence, noting that many defendants of similar age have similar medical conditions which the BOP can provide appropriate medical care.

Additionally, Mr. Nocito's medical condition can be well-treated in the BOP system. The United States' provided Mr. Nocito's medical history to BOP medical staff. In response, BOP Regional Director Diane Sommer, M.D. authored a letter detailing the BOP's capabilities to address and to treat Mr. Nocito's medical conditions.  *See attached*, BOP Letter, Aug. 23, 2023, Govt. Ex. 3.  In her letter, she detailed the various levels of care available to inmates based upon their medical needs, and how the BOP facilities manage inmate medical care. She stated that "[F]ederal Medical Centers are prisons that provide in-patient care to seriously ill inmates.  The BOP has seven of these facilities…which can provide chemotherapy, pain management clinics dialysis, and hospice care for terminally ill inmates." She further recognizes the quality of care at prison medical facilities. "BOP facilities are accredited by the Joint Commission on Accreditation

for Health Care Organizations, and if necessary, BOP facilities contract with medical centers in the vicinity if specialized medical treatment is necessary." *Id*. p. 2.  No doubt whatever BOP facility Mr. Nocito to which is designated he will receive adequate medical attention.

Of course, sentencing courts are keenly aware of the BOP medical treatment capability to treat elderly or sick patients, and therefore have rejected defense arguments that defendants should not be incarcerated because of a specific medical condition.  For example, in *United States* v. *Turner*, 531 F. Supp.2d 123, 124-125, 127-128 (D.D.C 2008), the Court rejected the defendant's motion for a downward departure based upon an advanced medical illness, finding that the illnesses were only "chronic" and not "acute" and that the BOP could provide the necessary medical care:

> [A]sthma requiring treatment with steroids and inhalers; sleep apnea requiring the use of a continuous positive airway pressure ("CPAP") device and oxygen at night; post-traumatic stress disorder resulting in headaches and seizures; congestive heart failure; gout and degenerative joint disease occasionally requiring treatment with narcotics; diabetes, which was treated by medication but not fully controlled; severe peripheral neuropathy; renal failure; temporary spells of blindness; and a possible autoimmune disease such as lupus.]

*Id*. at 127.  Similarly, in  *United States v. Schindler*, the court rejected defendant's downward departure motion for under 5H1.4, stating that his low back pain, cardiac problems and dental ailments can be adequately treated by the Bureau of Prisons.  *Schindler*, *Id.* 200 U.S. Dist. LEXIS 9029 (EDPA 2000).

The Court in *Krilich*  equally understood that age-related health limitations alone do not justify a downward departure and nevertheless, can be accommodated in prison:

> "Extraordinary" is a subset of "unusual." We have held that the limit to "extraordinary" conditions must be taken seriously, *citing United States v. Woody*, 55 F.3d 1257, 1275-76 & n.15 (7th Cir. 1995).  The court further stated:
>
>  "Almost everyone is "unusual" in some respect, and many septuagenarians have conditions similar to *Krilich*'s. Yet 5H1.1 and 5H1.4 put normal age-related

features off limits as grounds for reduced sentences. Older criminals do not receive sentencing discounts. Many persons in poor health are confined in federal prisons. If the medical problem is extraordinary in the sense that prison medical facilities cannot cope with it, then a departure may be appropriate. (citation omitted). To justify such a conclusion, however, the court "must ascertain" through competent medical testimony, that the defendant needs constant medical care, or that the care he does need will not be available to him should he be incarcerated. (*Citing, United States v. Albarran*, 233 F. 3d 972, 978 (7th Cir. 2000)). *United States v. Krilich*, 257 F.3d 689, 693 (7th Cir. 2001).

Mr. Nocito does not qualify for home confinement since he is not a seriously infirm defendant. A defendant's request for home confinement was rejected in *United States* v. *Poetz*, 582 F.3d 835, 838 (7th Cir. 2009). In *Poetz*, the defendant, who pleaded guilty to stealing approximately $300,000 from the government, suffered from various gastrointestinal disorders, seizure disorder, several upper respiratory diseases, arthritis, and early onset diabetes. *Id*. At 836-38. In affirming a custodial sentence, the Seventh Circuit noted that the sentencing judge "explained that despite Poetz's medical issues, a period of incarceration was 'fundamentally required' to promote respect for the law, provide for deterrence, and hold Poetz accountable for her breach of the trust placed in stewards of public funds." *Id*. at 838.

Moreover, all requests for a departure from the Guidelines must be balanced against the seriousness of the crimes. The Court is well aware of the magnitude and seriousness of this complex, multi-million dollar tax fraud scheme, and it need not be reminded its import to the Office of the United States Attorney, the Department of Justice and the citizens of the Western District. The 6th Circuit in <u>Davis</u> emphasized the dangers of allowing *de minimus* sentences based on age or illness for white collar fraud defendants:

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. And while age may well be an appropriate factor in choosing to grant a downward variance, the notion that the status of being 70 years old makes serving any prison time pointless is far from self-evident. (citations omitted). ("[E]ight judges of this court, still in service, are seventy year old or older. Many

persons in business continue to serve in important capacities beyond 70 years of age." *United States v. Davis*, 485 F.3d 491, 498 (6th Cir. 2006).

For similar reasons, Mr. Nocito does not deserve an age or health related downward departure.

### C. Mr. Nocito's Charitable Contributions Are Merely Magnanimous Gifts Made From His Excess Wealth

Mr. Nocito further argues that he should receive a lesser sentence because of his charity to others. However, his charity or generous acts to others discussed in the Defendant's character letters are not sufficient to reduce his sentence below the recommended Guidelines.

In some rare instances, the Sentencing Guidelines allow for a sentencing departure based upon either "civic, charitable, or public service; or record or prior good works. *See* USSG §5H1.11. However, it is rarely recognized at sentencing for obvious reasons. A defendant, particularly a wealthy or prominent one, should not be able to exchange "dollars for days" in prison. For the majority of high profile white collar fraudsters who have worked in the business community, it is expected that over the years they might have earned "community credibility" or donated time or money to worthy causes. That is not unique nor extraordinary. The Defendant should have to demonstrate that the recipient of the charity or "good work" cannot continue to benefit from it if the Defendant is incarcerated. And mere financial donations which can legitimately be "written off" are not enough to depart. In fact, they are largely discouraged. The good works contemplated by §5H1.11 instead need to be "exceptional." *See* USSG Manual Ch. 5, Pt. H, intro. comment (departures based on discouraged factors should occur only "in exceptional cases"). Courts have agreed. *See*, *United States v. Morken,* 133 F.3d 628 (8th Cir. 1998). There, the court concluded that the defendant's activities, which consisted of advising local business owners, hiring young people, serving on a church council, and raising money for charity, were "laudable, . . . [but] neither exceptional nor out of the ordinary for someone of his income and preeminence in a small

36

Minnesota town with a population barely over a thousand." *Id.* at 630. Accordingly, the court of appeals reversed the district court's downward departure.

Here, Mr. Nocito cites to his years of business associations, the friendships he developed, and the financial support he has given to others. He referenced to "millions of dollars" donated to charitable organizations such as the Catholic Church and Robert Morris University. PSR Obj. p 14-15. He attached multiple character letters which detail random acts of kindness. *Id.* While these are notable, they are not exceptional by the Guidelines standards. (*by saying this, the United States does not find them insignificant to those who benefitted, nor the sincerity of his acts*). And, for someone who has accumulated prestige, wealth and position in the community, they are likely obligatory.[15] The *Tocco* court cautioned sentencing judges about being moved to depart by a defendant's generous acts, particularly if financially motivated:

> "In assessing the effect of Tocco's community involvement in this case, we believe that much of Tocco's contributions may have consisted of contributions of money, not time and energy. If that is so, then Tocco's socio-economic status, i.e., his wealth and his ability to donate to various civic and charitable causes. Consideration of that factor is prohibited by guidelines. *USSG Sec. 5H1.11*. This, perhaps, is an expression of the ancient concept of justice that a man of wealth, position, power, and prestige  should not be given special consideration in the law." *United States v. Tocco*, 200 F.3d 401,433 (6th Cir. 2000); accord, *United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990) ("To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the guidelines.").

Therefore, Mr. Nocito does not deserve a departure on this basis.

### D.  Mr. Nocito's Children and Grandchildren Are Not Dependent Upon Him

Finally, Mr. Nocito's moves for departure based upon his "family circumstances" arguing that his children and grandchildren "rely heavily on (his) financial support" and somehow because of this he deserves a departure or a non-incarceration sentence. PSR Obj. pp. 6-7. The fact that

---

[15] Luke 12:48 states, "From everyone who has been given much, much will be demanded; and from the one who has been entrusted with much, much more will be asked

Mr. Nocito alleges that he should receive any type of sentencing relief including home confinement to continue to support his family, and specifically his children and grandchildren cannot be taken seriously, and should be outright rejected without consideration.

A downward departure based on family ties and responsibilities <u>should be the exception rather than the rule</u>. *United States v. Sweeting*, 213 F.3d 95 (3d Cir. 2000).  (emphasis added)  The fact that incarceration will "disrupt the family unit cannot be considered atypical, inasmuch as innumerable defendants no doubt could establish that their absence will cause a void in their children's lives.  As a practical matter, it may be said that most children look to their parents for support, guidance and stability." *Id. at 20.  See also, United States v. Matadumas-Briceno, 78 F. App'x. 837 (3d Cir.* 2003) (family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range and departure is the exception rather than the rule).

As the government previously explained in its <u>Response to Defendant's Objections to the PSR</u>, Mr. Nocito's children are fully-grown (in their 40s and 50s), and they are more than capable of caring for their own children, who are Mr. Nocito's grandchildren. To be clear, the Defendant's "grandchildren" are nowadays teenagers or in college. Only two would be considered minors, and are two of Joseph Jr's children.  His son, Joseph Jr. resides in a 17,000 sq. ft. home in Sewickley, and holds office in three of his father's companies, including the golf course Old Stonewall.  His daughter is a fitness instructor and an adult who also resides in Sewickley. Though Mr. Nocito may have endowed his children and grandchildren like any adoring grandparent, they will hardly be "strapped" if Mr. Nocito is incarcerated.  Indeed, there are many bedrooms in *Villa Noci.*  The typical "heartland" of cases where this exception is considered are more akin to the one parent homemaker/provider whose absence might cause extraordinary financial or emotional hardship to

minor children.  Not to heirs of family fortunes.

As such, in *Higgins*, the Third Circuit recognized that a downward departure based on family ties and responsibilities "should be the exception rather than the rule." *United States v. Higgins*, 967 F.2d 841, 846 (3d Cir.1992) (remanding to district court to determine, *inter alia*, if defendant's family ties and responsibilities fell within the "very narrow category" of "extraordinary"); accord, *United States v. Archuleta*, 128 F.3d 1446, 1450 (10th Cir.1997).

Even single parent defendants who are the sole providers of children have not warranted this departure in the Third Circuit's eyes.  *See*, *United States v. Sweeting,* 213 F.3d 95 (3d Cir. 2000); S*ee also*, *United States v. Bissell*, 954 F. Supp. 841, 892–93 (D.N.J. 1996), *aff'd,* 142 F.3d 429 (3d Cir. 1998); s*ee also, United States v. Headley,* 923 F.2d 1079, 1083 (3d Cir.1991) ("every court to consider the issue of departure based on the effect that sentencing a single parent to prison will have on minor children has found the circumstances not to be extraordinary"); *United States v. Goff,* 907 F.2d 1441, 1446 (4th Cir.1990) ("[defendant] has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts … parental relationships").

Moreover, that Mr. Nocito has multiple business who purportedly depend on his management is the unfortunate reality of seeing life through the desperate lens of a tax fraudster. According to the PSR, Mr. Nocito currently (and has not for a few years) held any active management in AHS, or any of his companies. He principally serves as a "consultant" a term we've heard many times in this case. AHS is currently extremely profitable, and will survive. See, *United States v. Sharapan,* 13 F.3d 781, 785  (3d Cir.1994),  (Third Circuit held that the district court erred in granting a downward departure related to the defendant's incarceration and business failure. The court noted that there was nothing extraordinary about the potential for incarceration

to "cause harm to the business and its employees) *accord*,, *United States v. Reilly,* 33 F.3d 1396

(3d Cir.1994) ("we see nothing extraordinary in the fact that [the Defendant's] conviction may

harm not only his business interests but also those of his family members."

## VI.    CONCLUSION

Wherefore, for all the aforesaid reasons, the only reasonable sentence in this case is

incarceration for at least 37 months and up to 46 months, in accordance with the recommended

guideline range in the Plea Agreement.


Respectfully submitted,

ERIC G. OLSHAN
United States Attorney


*/s/Gregory C. Melucci*
GREGORY C. MELUCCI
Assistant U.S. Attorney
PA ID No. 56777


*/s/Nicole A. Stockey*
NICOLE A. STOCKEY
Assistant U.S. Attorney
PA ID No. 306995


/s/*Matthew L. Cofer*
MATTHEW L. COFER
Trial Attorney
U.S. Department of Justice, Tax Division